[No. B027316. Second Dist., Div. Six. Nov. 18, 1988.]

DANIEL SMITH, Plaintiff and Respondent, v.
MARILYN RICKARD et al., Defendants and Appellants.

**COUNSEL**

Price, Postel & Parma, J. Terry Schwartz and Robert S. Patterson for Defendants and Appellants.

William M. Pfeiffer, Steven A. Sokol, Gov Hutchinson, Miller, Starr & Regalia and Harry D. Miller as Amici Curiae on behalf of Defendants and Appellants.

Matsinger & Blakeboro, Diane M. Matsinger, Alan A. Blakeboro and Harrison E. Bull & Associates for Plaintiff and Respondent.

**OPINION**

**GILBERT, J.**—A real estate broker represents a seller of a 50-acre parcel of commercial property. On the property is a residence and lemon and avocado groves. Here we hold that the broker has no duty to inspect that portion of the property containing the lemon and avocado groves in order

to disclose to the buyer facts that would affect the value or desirability of the property.

This appeal is from a judgment stemming from the jury's special verdict finding that real estate agents, defendants Marilyn and James Rickard, were negligent in fulfilling their duty to inspect and to disclose material defects in an avocado orchard on property sold to plaintiff Daniel Smith. The orchard was afflicted with the phytopthera cinnamommi fungus, also known as avocado root rot, a disease which destroys the feeder roots of the avocado tree, preventing it from receiving necessary moisture and nutrients. The disease, common in Santa Barbara orchards, is incurable and eventually kills the afflicted tree.

The trial court instructed the jury that the Rickards, as real estate brokers, had a duty to inspect the property and to disclose to Smith any material defects affecting the value or desirability of the property. The Rickards contend the court erred in giving this instruction because a duty arises only when the broker offers to sell a residential property (see Civ. Code,[1] § 2079 et seq.), and that the property here is agricultural or commercial in nature. Supporting the Rickards' position in this appeal, as amicus curiae, is the California Association of Realtors (Realtors).

Smith replies that the property is residential in nature, and that in any event, the Rickards owed him a fiduciary duty of care as they were his agents.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1983 George and Margaret Love listed with the Rickards their 50-acre property located in Santa Barbara's Glen Annie Canyon. The property included a residence, 12 acres of lemons and a 13-acre avocado orchard which the Loves cultivated commercially.

Prior to listing the property, the Rickards toured the property with Mr. Love. Mr. Rickard noticed several avocado trees which appeared "stressed." He asked about them, and Mr. Love explained that the trees were suffering from too much water. Mr. Love told him that some other avocado trees "might have drowned." Mr. Rickard, who himself owned two acres of avocados and was familiar with the problem of root rot, asked Mr. Love if he knew whether there was root rot on his property. Mr. Love answered, "Not to my knowledge." Mr. Rickard did not ask the Loves to conduct a root analysis (which is the only method of positively diagnosing root rot) nor did he pursue the matter in any other way.

---

[1] All statutory references are to the Civil Code unless otherwise stated.

Plaintiff Daniel Smith, a computer engineer who owned several investment properties, but had no farming experience, learned that the Love property was for sale. He called Mrs. Rickard and she and Mr. Love showed Smith the property. Mrs. Rickard gave Smith a descriptive flier which included estimated income from sales of the avocados and lemons over the previous three years. Smith told Mrs. Rickard that he was interested in buying the property as a residence for himself, and that he would need the income from the avocados to make the payments.

During this and other tours of the property, including a final inspection tour before the closing of escrow, Smith saw stressed avocado trees and those which had been "stumped" or removed. Mr. Love explained that the trees suffered from too much water and that some had drowned after heavy rains during the previous winter. At no time did the Loves or the Rickards mention to Smith that the avocado trees were or might be afflicted with root rot, nor did the Rickards advise Smith to obtain a laboratory analysis to determine if root rot were present.

Smith told Mrs. Rickard that he usually hired his own broker to represent him as buyer in real estate transactions, and he asked whether she thought that necessary in this instance. She said no, and offered to "take care of the job." Mrs. Rickard helped Smith obtain "creative financing" for his purchase of the property, including partial financing by the Loves.

Escrow closed on December 30, 1983. At the end of January, Smith and his foreman, Edward Gil-Gomez, noticed that about 250 avocado trees lacked vigor, were defoliated at the top, and were changing in color. They also discovered, in a storage shed, cans of a chemical called Terrazole, used to control root rot.

Smith consulted with George Goodall, the local farm advisor, who inspected the avocado grove and found 30 to 40 trees "in difficulty." On Goodall's recommendation, Smith contracted a laboratory to test root samples. Of the 41 samples analyzed, 40 percent tested positive for root rot.

Smith removed and destroyed hundreds of avocado trees, reducing his expected income flow. He fell behind in his mortgage payments, and in November 1984 his lenders (including the Loves, who held a deed of trust on one of Smith's other properties) served notices of default and later foreclosed. Smith filed for bankruptcy and was forced to sell the property for $150,000 less than he paid for it.

Smith filed suit for negligence and breach of contract against the Loves and the Rickards. He also alleged breach of fiduciary duty and constructive fraud against the Rickards, and fraud against the Loves. All causes of

action were based on the defendants' failure to disclose to Smith that the avocado trees were or might be afflicted with root rot.

Following a lengthy trial, the jury returned special verdicts finding that the Loves breached their contract with Smith and that the Rickards negligently fulfilled their duty as real estate agents to "conduct a reasonable and diligent investigation of the property and to disclose to [Smith] all facts that materially affected the value or desirability of the property that such an investigation would reveal[.]" The jury awarded Smith $72,928 in damages for the Rickards' negligence. The jury found in favor of the defendants on the fiduciary duty and fraud causes of action, finding inter alia that none of the defendants were liable for negligent or intentional misrepresentation or concealment. The trial court entered judgment in accordance with the jury's findings. The Rickards appeal.

## DISCUSSION

The trial court instructed the jury that a real estate broker or salesperson "is under a duty to a buyer to conduct a reasonably competent and diligent inspection of the property and to disclose to a buyer all facts that materially affect the value or desirability of the property that such an investigation would reveal. ▇ In exercising this duty, a real estate broker or salesperson is required to exercise the degree of skill that a reasonably prudent real estate broker or sales agent would exercise, and the failure to do so is negligence."[2]

The Rickards contend on appeal that the trial court committed reversible error because the inspection and disclosure duty of real estate brokers described in the instruction applies only to residential property, and not to commercial agricultural property. (See § 2079.) The Rickards contend that because the defect in the property related to its commercial value, their only duty to Smith was to disclose defects of which they had actual knowledge, and that they had no duty to inspect the property. The Rickards assert that because there is no evidence in the record that they had actual knowledge of the root rot, they were not negligent. (See *Cooper* v. *Jevne* (1976) 56 Cal.App.3d 860, 866 [128 Cal.Rptr. 724]; *Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729, 735 736 [29 Cal.Rptr. 201, 8 A.L.R.3d 537].)[3]

---

[2]The Rickards correctly point out that the instruction as given by the trial court is defective because it does not limit the brokers' duty to a *visual* inspection of the residential property. (See § 2079.)

[3]The trial court rejected an instruction proposed by the Rickards stating that "[t]he duty of the seller's broker to the buyer of property is to disclose to the prospective buyer any facts known to the broker that materially affect the value or desirability of the property. The broker has no duty to inspect the property."

## I.

In *Easton* v. *Strassburger* (1984) 152 Cal.App.3d 90 [199 Cal.Rptr. 383, 46 A.L.R.4th 521], the Court of Appeal held for the first time that real estate brokers have an "affirmative duty to conduct a reasonably competent and diligent inspection of the residential property listed for sale and to disclose to prospective purchasers all facts materially affecting the value or desirability of the property that such an investigation would reveal. [Fn. omitted.]" (At p. 102.) A broker who breaches this duty to inspect and disclose defects discoverable through reasonable diligence may be liable to the buyer for negligence. (*Id.* at p. 103.)

The *Easton* court limited its holding to residential property, expressing "no opinion here whether a broker's obligation to conduct an inspection for defects for benefit of the buyer applies to the sale of commercial real estate. Unlike the residential home buyer who is often unrepresented by a broker, or is effectively unrepresented because of the problems of dual agency [citations], a purchaser of commercial real estate is likely to be more experienced and sophisticated in his dealings in real estate and is usually represented by an agent who represents only the buyer's interests. [Citation.]" (*Easton* v. *Strassburger, supra,* 152 Cal.App.3d 90, 102, fn. 8.)

The Legislature codified the holding in *Easton,* adding sections 2079 - 2079.5, which state in part that "[i]t is the duty of a real estate broker . . . to a prospective purchaser of *residential real property comprising one to four dwelling units* . . . to conduct a reasonably competent and diligent visual inspection of the property offered for sale and to disclose to that prospective purchaser all facts materially affecting the value or desirability of the property that such an investigation would reveal . . . ." (§ 2079, italics added; see also statement of legis. intent, West's Ann. Civ. Code, § 2079 (1988 cum. pocket pt.) under heading 1985 Legislation, p. 25.)

■ We agree with the Rickards and Realtors that the Legislature intended the duties set out in section 2079 to apply only to brokers selling residential properties of four or fewer dwellings, and not to commercial real estate transactions. As discussed, *infra,* the *Easton* court expressly offered no opinion as to whether brokers have a duty to inspect commercial properties, nor did the opinion limit or define the "residential properties" to which the duty to inspect applied.

The Legislature in enacting section 2079 et seq. attempted to set forth a comprehensive declaration of duties, standards and exceptions and to define "the duty of care found to exist by *Easton* v. *Strassburger,* and the manner of its discharge." (See statement of legis. intent, West's Ann. Civ. Code, § 2079, *supra,* at p. 25.)

The Legislature intended that this duty of care not apply to the sale of commercial properties or residential properties with more than four dwelling units. ■ "If a statute enumerates the persons or things to be affected by its provisions, there is an implied exclusion of others, and if a statute specifies one exception to a general rule, other exceptions or effects are excluded; in other words, as has been frequently held, a general provision of a statute is controlled by a specific and express exception. It is an elementary rule of construction that the expression of one excludes the other. It is equally well settled that the court is without power to supply an omission." (*Estate of Pardue* (1937) 22 Cal.App.2d 178, 180-181 [70 P.2d 678].)

■ " '[G]eneral and comprehensive legislation, where course of conduct, parties, things affected, limitations and exceptions are minutely described, indicates a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter.' (2A Sutherland, Statutory Construction (Sands 4th ed. 1984) § 50.05, pp. 440-441.)" (*I.E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285 [216 Cal.Rptr. 438, 702 P.2d 596].)

## II.

Realtors point out that section 2079 et seq. is one of those statutory schemes where the Legislature distinguishes between residential and commercial properties in order to protect unsophisticated buyers and owners of residential property from those with greater knowledge and bargaining power. (See, e.g., § 1675 et seq. (default protection); § 1695 et seq. (home equity sales contract requirements); § 2373 et seq. (disclosure requirements for real estate agents); § 2956 et seq. (lenders' disclosure requirements for purchase money liens); § 2954.9 (prepayment rights on residential property); Code Civ. Proc., § 580b (anti-deficiency protection)).

■ Did the Legislature intend to protect buyers of the type of property sold here when it codified the *Easton* duty of care? The Rickards and Realtors argue that section 2079 does not apply because the property Smith bought was primarily commercial, and because the defect concerned only the avocado orchards, not the residence.

Smith responds that the *Easton* duty to inspect applies to his property because it was listed as residential in the multiple listing service, he purchased it as a residence, and the agricultural income was important only in order to keep up payments.[4] He contends that brokers are under a duty to

---

[4] At oral argument, Smith asserted that section 2079 does not apply to this case because the transaction took place before the Legislature enacted the statute. The statute was in effect by time of trial, however, and the jury instruction was expressly derived from *Easton*. Section 2079 is no more than a codification and clarification of that case. (See statement of legis. in-

inspect material defects in the entire property, not only in the residential portion.

Although the Legislature has enacted many statutes protecting buyers of residential property, it has not uniformly defined the protected class. For example, the code section which requires real estate agents to make certain disclosures to sellers and buyers applies to real property "which *constitutes or is improved with* one to four dwelling units . . . ." (§ 2373, subd. (j), italics added.) Similarly, the statute which requires certain disclosures by sellers of residential real property applies to property "*improved with or consisting of* not less than one nor more than four dwelling units." (§ 1102, italics added.)

One might argue that Smith is protected by these statutes because his property is "improved" with one, and not more, dwelling units. These statutes do not expressly or impliedly require that the property be of limited acreage, nor do they require that the property be used only for residential purposes. In a similar vein, Smith argues that because his residence is on the property, he comes within the protection of section 2079. Under this reasoning, if the prospective purchaser of a large factory intends to live in a home on the same land as the factory, the entire real property on which both the factory and the house are located would be covered by the statute.

Other protective statutes apply more specifically to an exclusive class. The statute which protects buyers from unfair liquidated damages clauses in real estate contracts, for example, applies to real property "*primarily* consisting of a dwelling . . ." which the buyer intends to occupy. (§ 1675, subd. (a), italics added.) This statute would not protect Smith because his 50-acre property does not "primarily" consist of a single dwelling. Still yet other statutory schemes designed to protect homeowners also require that the owner occupy one of the dwelling units. (See, e.g., § 1695.1, subd. (b); Code Civ. Proc., § 580b.)

In contrast, section 2079 does not specifically limit the definition of residential real property other than to state that its scope is limited to residential real property ". . . comprising one to four dwelling units." ■ The word "comprise" means "1. [T]o include or contain . . . 2. . . . . to consist of; be composed of . . . ." (The Random House Dict. of the English Language (2d ed. unabridged 1987) p. 277) and so can be inclusive or exclusive of other uses. Therefore, one could argue that the language "comprising one to four dwelling units" does not necessarily mean that the property may not include other, nonresidential uses. Such an argument would be more

---

tent, West's Ann. Civ. Code, § 2079 (1988 cum. pocket pt.) under heading 1985 Legislation, *supra*, at p. 25.) Even if the statute has no retroactive effect, it does guide our interpretation of the duty established in *Easton*.

persuasive in the case where a buyer intends to use a room in the residence as an office for business or profit-making activities.

■ The presence of a residence on the commercial property does not transform the property into residential property. The property here had 25 acres of income-producing fruit trees. Although Smith lived on the property, he purchased it with the intent to continue to grow and sell avocados. That his reason for purchasing the land was to use the profits from the sale of the avocados to make his payments for the ranch does not alter the nature of the property.

Here it is not difficult to draw the line between the residential and commercial portions of the property. An inspection of the property as contemplated by section 2079 would have disclosed facts only affecting the value of the avocado grove, the commercial portion of the property. The statute does not limit the brokers' duty to an inspection of the dwelling units, nor does it require that the disclosable defect relate to the value or habitability of the dwelling unit. It imposes a duty on the broker to conduct a "reasonably competent and diligent visual inspection of the *property* offered for sale and to disclose to that prospective purchaser all facts materially affecting the *value or desirability of the property* . . . ." (§ 2079, italics added.) This refers, however, to residential property.

In *Easton,* the value of the property as a residence was affected by the soil condition. The statute was not meant to apply in a situation where the value of a residence may be indirectly affected by a defect in the commercial portion of the property.

Even though Smith may have been motivated to purchase the property because of the residence, the defect in the property concerned not the residence, but only the commercial portion of the property. This precludes the application of section 2079.

## III.

Smith contends that the instruction was proper notwithstanding section 2079 because the Rickards had a fiduciary relationship with him, in that they represented him as buyer in addition to representing the Loves as seller. Therefore, the jury found them negligent as fiduciaries.

We agree that there is evidence to support the position that the Rickards were in a fiduciary relationship with Smith, and that the jury could have found them negligent as fiduciaries for failing to inspect the property and disclose to Smith the potential existence of root rot. ■ A broker who negotiates a sale of his own listing to a buyer who also engages him as a broker, will be a dual agent. (1 Miller & Starr, Cal. Real Estate (1987 supp.)

§ 4:18, p. 47.) ██ An agent must exercise reasonable skill and care for the benefit of the principal in the performance of agency duties, and will be liable for any damages suffered by the principal as a result of the agent's negligence. (1 Miller & Starr, Cal. Real Estate (1975) § 4:19, p. 58.) Those duties may include inspecting the property and disclosing any material defects to the principal. (See, e.g., *Brady* v. *Carman* (1960) 179 Cal.App.2d 63, 68-69 [3 Cal.Rptr. 612]; *Montoya* v. *McLeod* (1985) 176 Cal.App.3d 57, 64-65 [221 Cal.Rptr. 353].)

Here, however, the jury's special verdict on negligence was expressly based on the premise that Smith was the buyer, and not in an agency relationship with the Rickards. The instructions regarding the Rickards' potential liability for negligence identified the parties as broker and buyer, and were distinguishable from instructions regarding the causes of action for breach of fiduciary duty and misrepresentation. During closing argument, Smith's attorney reminded the jury that for purposes of the negligence cause of action they need not determine whether the Rickards were agents of Smith.

██ It does not matter that in the special verdict regarding breach of fiduciary duty the jury found that the Rickards were agents of Smith, because the jury also found that the Rickards did not breach those duties. Smith may not now change his position and defend the judgment on appeal with a new and different theory not presented to the jury. (*Van Kempen* v. *Hayward Area Park etc. Dist.* (1972) 23 Cal.App.3d 822, 826 [100 Cal.Rptr. 498].)

The judgment is reversed. The parties are to bear their own costs on appeal.

Stone, P. J., and Abbe, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 1, 1989.