Filed 4/13/26  Amstutz v. Pine Mountain Club Property Owners Assn. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CHRISTINE V. AMSTUTZ, | F089443 |
| Plaintiff and Appellant, | (Super. Ct. No. BCV-24-102505) |
| v. | |
| PINE MOUNTAIN CLUB PROPERTY OWNERS ASSOCIATION, INC. et al., | **OPINION** |
| Defendants and Respondents. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gregory A. Pulskamp, Judge.

Lamberto Law Office and Peter N. Lamberto for Plaintiff and Appellant.

Kulik Gottesman Siegel & Ware and Gerard R. Kilroy for Defendant and Respondent Pine Mountain Club Property Owners Association.

Zelms Erlich Lenkov, Robert P. Wargo, Rinat Klier-Erlich and Gayley Buckner for Defendants and Respondents Jeff Mowrey and Jennings Real Estate.

-ooOoo-

Plaintiff/appellant Christine Amstutz appeals from two orders sustaining demurrers to Amstutz's first amended complaint (FAC) without leave to amend, and dismissing the demurring parties, i.e., defendant/respondent Pine Mountain Club Property Owners' Association, Inc. (PMCPOA), and defendants/respondents Jeff Mowry and Jennings Real Estate (JRE), from the litigation.  We affirm both orders in their entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Original Complaint and Related Proceedings

On July 24, 2024, Amstutz filed her original complaint against PMCPOA, Mowry, JRE, and other defendants in connection with Amstutz's purchase of two lots (Lot A and Lot B) (collectively, the Lots or Subject Lots) within the Pine Mountain Club community, located in Frazier Park, California.[1]  Amstutz alleged that the PMCPOA is a "legal successor[]-in-interest" to prior owners of the land, and that those prior owners subdivided the land, marketed the individual lots, and impliedly warranted the lots "as fit for residential construction"; and that the PMCPOA "assumed all rights, duties, fiduciary duties, and obligations of [those prior owners]."  She alleged Mowry and JRE were the real estate agent and brokerage, respectively, who represented the sellers of Lot B.

In the original complaint, Amstutz alleged that, after she purchased the Subject Lots, she discovered they were "subject to periodic catastrophic flooding from artesian springs" underneath the Lots.  In essence, Amstutz alleged that all defendants had a duty (fiduciary or otherwise) to disclose that the Lots were flood prone; that "some defendants … had actual knowledge of this [flooding] condition, and failed to disclose it," and that

---

[1]    The other named defendants included real estate agent Robert Haas, and real estate brokerage Pinnacle Estates Properties, Inc. (both of whom allegedly represented Amstutz in connection with the purchases of the Subject Lots); Wayne Bise and Rewards Realty (both of whom allegedly represented the seller of Lot A); Oran S. Kirby (who allegedly was the seller of Lot A); the Voyt Evald Amanowicz and Ira Amanowicz Revocable Trust dated May 15, 2006 (the Amanowicz Trust) and its trustees, Voyt and Ira Amanowicz (collectively, the Amanowiczes) (who allegedly were sellers of Lot B, and were represented in that transaction by Mowry and JRE).

2.

"[o]ther defendants breached their duty to discover and advise [Amstutz] of the [flooding] condition .…"

On August 22, 2024, defendants Haas and Pinnacle Estates Properties, Inc. (PEP), nonparties to the appeal, who were alleged to be Amstutz's real estate agent and broker, respectively, demurred to the original complaint, and moved to strike portions of the original complaint. On October 8, 2024, the trial court overruled the Haas/PEP demurrer, but granted the motion to strike with leave to amend. On October 10, 2024, Amstutz filed her FAC.[2]

## II. Allegations in the FAC

In her FAC, Amstutz alleged the following facts and legal contentions:

### A. Allegations Relevant to PMCPOA

In or about 1970, nonparty Pine Mountain Club, Inc. (PMC, Inc.) "acquired title to all of the residential property within the boundaries of the new development designated Pine Mountain Club, Inc." and "proceeded to market the individual residential lots it had subdivided, and warranted them as fit for residential construction." Amstutz alleged PMCPOA is, and has been, "the legal successor[]-in-interest of Pine Mountain Club, Inc. … since 1975" and that, "[a]s such, … the [PMCPOA] assumed all rights, benefits,[3] duties, fiduciary duties, and legal obligations of Pine Mountain Club, Inc."

Every lot within the development, including Lot A and Lot B "was marketed with the implied-in-law covenant that it was fit for the purpose [of] residential construction,

---

[2] Amstutz removed the following named defendants from the FAC's caption, and provided the following explanations in the FAC's allegations: Wayne Bise (alleged to be "now deceased"), Rewards Realty (alleged to be a "former named defendant"), Oran S. Kirby (alleged to have relocated to Tennessee with "no intention of returning to California to be subject to its jurisdiction"), and the Amanowiczes and Amanowicz Trust (alleged to be "formerly named defendants").

The register of actions indicates that said defendants were "Removed: 10/10/2024."

[3] Amstutz alleged the benefits PMCPOA obtained included "an annual assessment to all members so the [PMCPOA] could meet its expenses and obligations to its members."

for which it was being sold" (warranty of fitness)  Amstutz alleged the warranty of fitness runs with each of the Lots until PMC, Inc. and PMCPOA "formally withdraw[] or repudiate[] [the] warranty of fitness" and that PMCPOA "continues to warrant that Lots A and B are fit for residential construction."  Amstutz alleged that PMCPOA "warranted, when [the Subject Lots] were first marketed (by its predecessor in interest, PMC, Inc.), in or about 1970, that both lots were fit for the purpose of residential construction."

Lot A was improved with a residence in 1990.  Lot B, which is contiguous to Lot A, has never been improved.

In 2017, Amstutz purchased the Subject Lots "in separate transactions" involving different sellers.  Prior to purchasing the Lots, Amstutz was not "warned or otherwise advised that [the Lots] were subject to periodic catastrophic flooding from artesian springs" and, prior to May 2023 "when the springs erupted suddenly," had "no reason to believe or discover," nor was it reasonable for her to suspect, she had been harmed as a result of her purchase.

Amstutz alleged "some defendants … had actual knowledge of [the flooding] condition, and failed to disclose it.  Other defendants breached their duty to discover and advise [Amstutz] of the condition .…"

PMCPOA was not the owner of Lot A or Lot B when it was sold to Amstutz.  Moreover, there are no allegations in the FAC that PMCPOA was ever the owner of record for either of the Subject Lots.  However, it is fair to infer from the allegations of the FAC that Amstutz contends PMCPOA had actual knowledge of the alleged condition at issue.  She alleges that, "between 1970 and 1988, due to periodic catastrophic flooding" PMCPOA installed "a drainage system under the [Subject Lots], including an approximately eight inch drain pipe which appears to run from under Lot B, and under Lot A, daylighting from under Lot A through a pipe that runs under" a neighboring street.

Amstutz alleged that, PMCPOA had a "special fiduciary relationship with each owner and prospective purchaser of [the Subject Lots], because of its position of trust

4.

with all members, including a fiduciary duty to prevent fraudulent transactions by all sellers of [the Lots], and a duty to prospective purchasers not to be defrauded or swindled." Yet, PMCPOA "never warned anyone, … that the original warranties of fitness … were no longer valid, and that neither Lot was fit nor suitable for residential construction, due to periodic but unpredictable catastrophic flooding .…" In doing so, Amstutz alleged PMCPOA breached its fiduciary duty to both prior purchasers and prospective purchasers of Lot A and Lot B and "set in motion a series of property 'fraud by concealment' sales by owners to new buyers, at ever increasing prices, the last of which was [Amstutz] in 2017."

Amstutz alleged that, "if full disclosures had been made by every defendant …, to any potential purchaser in [Amstutz's] position, instead of the fraudulent concealment of true conditions, neither Lot would have had any market value, at any time, which … is the present case." "Each defendant … played an additional and assumedly independent and separate role in this fraudulent chain of concealment for 40+ years. In 2017, [Amstutz] was duped by these non-disclosures by every defendant …, each of which had an independent fiduciary relationship with [Amstutz], into paying $256,000 for Lot A and $19,000 for Lot B."

PMCPOA "intended to deceive persons in [Amstutz's] position …, by concealing the flooding issue. If the disclosures had been made, [Amstutz] would not have purchased either property .…" She alleged PMCPOA "acted with malice and/or a conscious disregard of [her] rights and safety, or [was] grossly negligent in its actions of nondisclosure and concealment" and that she is entitled to "reasonably foreseeable damages" caused by this conduct, "including her financial losses, emotional distress, general damages, and punitive damages .…"

Based on the above allegations, Amstutz purported to state a cause of action against PMCPOA for "fraud or deceit by concealment, and failure to prevent wrongful conduct .…" (Boldface and capitalization omitted).

5.

### B.      Allegations Relevant to Mowry and JRE

The above allegations were incorporated by reference into Amstutz's second cause of action against Mowry, JRE, Haas and PEP for breach of fiduciary duty.

With regard to Mowry and JRE, Amstutz alleged they "had a fiduciary duty of care to [Amstutz], by reason of their relationship to [Amstutz] as the agent and broker for the sellers of Lot B .…" Amstutz alleged that Mowry and JRE had a duty "to make a competent and vigorous visual inspection to discover [and] disclose any material defects" in Lot B, and that "[s]uch an inspection, …, would have included questions about the reasons Lot B was undeveloped for forty-seven years since being offered for residential development" while all other lots were improved with residences.

Amstutz alleges that Mowry and JRE did not "make a competent and vigorous visual inspection" of the Lots and that, if they had, she "would not have been deceived about a major defect" in the properties, i.e., the "periodic catastrophic flooding from underground springs," which would have "materially affected her judgment about whether to purchase" the Lots. Amstutz alleged that she relied on Mowry and JRE performing their duties competently, that they were grossly negligent for not performing their duties."

### C.      Allegations Relevant to PMCPOA, Mowry and JRE

All of the above allegations were incorporated into Amstutz's third and final cause of action against all defendants. Amstutz alleged each defendant owed her "a duty of reasonable care, …, to discover defects such as catastrophic artesian springs flooding both [Subject Lots] and rendering them unfit for residential construction." She alleged that each defendant was "negligent in failing to exercise reasonable care," that she "relied on each defendant's representations," and that she suffered "significant financial damages and emotional distress" as a result.

6.

### D. *Demurrers and Concurrent Motions to Strike*

On November 8, 2024, PMCPOA demurred to the FAC on grounds the causes of action against it (i.e., the first and third causes of action) do not state facts sufficient to constitute a cause of action (Code Civ. Proc., § 430.10, subd. (e)) and demurred to the first cause of action for fraudulent concealment on grounds it is uncertain, ambiguous and unintelligible (*id*., subd. (f)).[4]  Concurrently, PMCPOA filed a motion to strike certain allegations from the FAC pertaining to Amstutz's request for punitive, exemplary, and emotional distress damages.  PMCPOA further contended case law has "reject[ed] such a fiduciary relationship and [has] held that a homeowners' association, not a party to the transaction, has no obligation to disclose even known conditions to a prospective purchaser."  Finally, PMCPOA argued, "implied warranties do not extend beyond the original purchaser."

On November 13, 2024, Mowry and JRE demurred to the second and third causes of action in the FAC, which were the only causes of action against them, on grounds the FAC did not set forth facts sufficient to state a cause of action against them.  (Code Civ. Proc., § 430.10, subd. (e)) and on grounds the causes of action are uncertain (*id*., subd. (f)).  Like PMCPOA, Mowry and JRE also filed a concurrent motion to strike allegations from the FAC pertaining to Amstutz's request for punitive, exemplary, and emotional distress damages.

In their demurrer, Mowry and JRE argued that, as agents representing the seller of Lot B, they owed no fiduciary duty to Amstutz, a prospective purchaser.  Mowry and JRE also argued that the alleged property defect was not discoverable via visual inspection, that Amstutz does not allege they had knowledge of the alleged defect, and that they were only required to disclose property defects known to them.

---

[4]    PMCPOA had filed its own demurrer to the original complaint four days after Haas and PEP filed their demurrer.  However, because Amstutz filed her FAC before PMCPOA's demurrer could be heard, the trial court vacated the hearing on PMCPOA's original demurrer.

### III. The Trial Court Sustains Demurrers to the FAC

On December 30, 2024, the trial court sustained PMCPOA's demurrer without leave to amend, ordered the action dismissed with prejudice as against PMCPOA, and deemed PMCPOA's motion to strike moot. Similarly, on December 31, 2024, the trial court sustained Mowry and JRE's demurrer without leave to amend, ordered the action dismissed with prejudice as against Mowry and JRE, and deemed their motion to strike moot.

No notice of entry of the aforementioned orders, or filed-endorsed copies of the orders, were served on Amstutz. On March 6, 2025, Amstutz timely filed her notice of appeal. (See Cal. Rules of Court, rule 8.104(a)(1)(C) [180 days to appeal if party is not served with a filed-endorsed copy of the order or notice of its entry].)

## DISCUSSION

### I. Standard of Review

"The standard of review on appeal from a judgment dismissing an action after sustaining a demurrer is well settled and can be summarized as follows: 'The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed "if any one of the several grounds of demurrer is well taken. [Citations.]" [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory.'" (*County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1009–1010.)

"As a court of review, we are 'not bound by the trial court's construction of the pleadings. Rather, the reviewing court must make its own independent judgment thereon, even as to matters not expressly ruled on by the trial court.' [Citation.] Where, as here, the demurrer 'is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial

8.

court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.'" (*County of Fresno v. Shelton, supra*, 66 Cal.App.4th at p. 1010.)

"A trial court's order or judgment is presumed correct, and '"[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent."'" (*Pinto Lake MHP LLC v. County of Santa Cruz* (2020) 56 Cal.App.5th 1006, 1012; accord, *Kinney v. Superior Court* (2022) 77 Cal.App.5th 168, 177 [same].) "The plaintiff bears the burden on appeal to show the trial court erred by sustaining a demurrer." (*SLPR, L.L.C. v. San Diego Unified Port Dist.* (2020) 49 Cal.App.5th 284, 317.)

## II.    The Causes of Action Against PMCPOA

On appeal, Amstutz contends PMCPOA owed her a duty to warn her about the potential for flooding of the Subject Lots under the holding and reasoning in *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 (*Tarasoff*). Amstutz argues that section 315 of the Restatement Second of Torts, relied on by the court in *Tarasoff*, supports the conclusion that a "special relationship" existed between her and PMCPOA such that PMCPOA had a duty to warn her of the flooding condition. Amstutz further contends that PMCPOA had a fiduciary duty to act in her best interests, and that it breached that duty by failing to warn her of the flooding condition.

In response, PMCPOA first argues that the allegation it is the "'legal successor[]-in-interest'" to PMC, Inc. is a conclusion of law which this court should not accept as true on demurrer and that, in any case, any implied warranties given to original purchasers within the Pine Mountain Club community do not extend to subsequent purchasers. PMCPOA next argues case law establishes that homeowners' associations do not owe fiduciary duties to prospective purchasers of properties within the community serviced by the homeowners' association. PMCPOA also argues *Tarasoff* is not applicable and that *Kovich v. Paseo Del Mar Homeowners' Assn.* (1996) 41 Cal.App.4th 863 (*Kovich*) stands for the proposition that homeowners' associations owe no duty to

9.

warn prospective purchasers of defects in property being sold by owners in the community.

For the reasons discussed below, we believe PMCPOA has the better arguments.

### A.     The Allegation That PMCPOA is the Legal Successor-in-interest to PMC, Inc.

Amstutz contends PMC, Inc. impliedly warranted that the Subject Lots were fit for residential construction, that the warranties have survived successive changes in ownership of the Lots, and that PMCPOA is bound by those warranties because it is the "legal successor[]-in-interest" to PMC, Inc.  In response, PMCPOA argues the contention that it is the "'legal successor[]-in-interest'" to PMC, Inc. is a legal conclusion unsupported by factual allegations.  PMCPOA also argues that the alleged implied warranties issued by PMC, Inc. did not survive the successive change in ownership of the Subject Lots.  We find PMCPOA's arguments persuasive.

We agree that the contention PMCPOA is a legal successor-in-interest is a legal conclusion and we are not required to accept it as true on review of the demurrer.  We have reviewed the allegations of the FAC and find no factual allegations that would support the conclusion.  There are no allegations concerning any transactions, deeds, or agreements between PMC, Inc. and PMCPOA, and there are no exhibits to the complaint from which we may conclude PMCPOA is the legal successor-in-interest to PMC, Inc.

Thus, even if we were to agree that the alleged warranties made by PMC, Inc. survived subsequent, successive transfers of title to the Subject Lots, we are unable to assume for purposes of our review that PMCPOA assumed those warranties.  (See *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 ["We do not, …, assume the truth of contentions, deductions, or conclusions of fact or law."].)[5]

---

[5]     We note that Amstutz did not address the challenge to its assertion that PMCPOA was the legal successor-in-interest to PMC, Inc. in its opening brief—even though the point was raised by PMCPOA in its demurrer to the FAC.  Despite knowing that the issue had been raised

### B.     *Tarasoff*

The *Tarasoff* case concerned the murder of Tatiana Tarasoff by Prosenjit Poddar, an individual who had been treated by a psychologist working for a hospital at the University of California at Berkeley.  (*Tarasoff, supra*, 17 Cal.3d at p. 430.)  Tatiana Tarasoff's parents brought suit against the university, the psychologist, other doctors at the facility, and other defendants, alleging, among other things, Poddar had disclosed his intention to kill Tatiana to the psychologist, Poddar had been briefly detained by the police at the psychologist's request, but was released because the officers determined Poddar appeared rational, the psychologist's superior directed no further action be taken to detain Poddar, and no one ever warned Tatiana or her parents of the peril Tatiana faced.  (*Ibid.*)  The defendants in *Tarasoff* demurred to the complaint, arguing, among other things, that "they owed no duty of reasonable care to Tatiana .…"  (*Id.* at pp. 430, 431.)  The trial court sustained the demurrer and Tatiana's parents appealed.  (*Id.* at p. 430.)

The California Supreme Court determined "that defendant therapists cannot escape liability merely because Tatiana herself was not their patient."  (*Tarasoff, supra*, 17 Cal.3d at p. 431.)  The high court wrote:  "When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger.  The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case," which may include "warn[ing] the intended victim or others likely to apprise the victim of the danger, … notify[ing] the police, or … tak[ing] whatever other steps are reasonably

by PMCPOA in its demurrer, Amstutz waited until its reply brief to address the issue.  In doing so, it denied PMCPOA a fair opportunity to respond to its arguments.

Notwithstanding, in her reply brief, Amstutz admits she has no information as to the details of any relevant agreement between PMCPOA and PMC, Inc. that would support the allegation.

necessary under the circumstances." (*Ibid*.) The high court determined that the parents should have been granted leave to amend to allege that, because the therapists "knew that Poddar was at large and dangerous, their failure to warn Tatiana or others likely to apprise her of the danger constituted a breach of the therapists' duty to exercise reasonable care to protect Tatiana." (*Ibid*.)

In analyzing whether defendant therapists owed legal duties to Tatiana and/or her parents, the court identified the "'"essential question"'" as "'"whether the plaintiff's interests are entitled to legal protection against the defendant's conduct."'" (*Tarasoff, supra*, 17 Cal.3d at p. 434.) It remarked, "'"[Duty] is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection."'" (*Ibid*.)

Citing and quoting *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*), the *Tarasoff* court noted that "liability should be imposed 'for an injury occasioned to another by his want of ordinary care of skill' as expressed in section 1714 of the Civil Code….[6] '"[W]henever one person is by circumstances placed in such a position with regard to another … that if he did not use ordinary care and skill in his own conduct … he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger."'"[7] (*Tarasoff, supra*, 17 Cal.3d at p. 434.) "We depart from 'this fundamental principle' only upon the 'balancing of a number of considerations'; major ones 'are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's

---

[6]     Undesignated statutory references are to the Civil Code.

[7]     Section 1714 currently reads, in relevant part: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself.…" (*Id.*, subd. (a).)

12.

conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.'" (*Ibid*., fn. omitted.)

The high court continued:  "The most important of these considerations in establishing duty is foreseeability.  As a general principle, a 'defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.'" (*Tarasoff, supra*, 17 Cal.3d at pp. 434–435.)  However, the high court recognized an important limitation to the general principle, writing:

> "[W]hen the avoidance of foreseeable harm requires a defendant to control the conduct of another person, or to warn of such conduct, the common law has traditionally imposed liability *only if the defendant bears some special relationship to the dangerous person or to the potential victim*…. [¶] Although, … , under the common law, as a general rule, one person owed no duty to control the conduct of another [citations], nor to warn those endangered by such conduct (Rest.2d Torts [(1965)], § 314, com. c.; Prosser, Law of Torts (4th ed. 1971) § 56, p. 341), the courts have carved out an exception to this rule in cases in which the defendant stands in some special relationship to either the person whose conduct needs to be controlled or in a relationship to the foreseeable victim of that conduct (see Rest.2d Torts*, supra*, §§ 315–320)." (*Tarasoff, supra*, 17 Cal.3d at p. 435, italics added, fn. omitted.)

The high court then found the relationship between the defendant therapists to either Tatiana or Poddar would suffice to establish a special relationship as discussed in section 315 of the Restatement Second of Torts.  (*Tarasoff, supra*, 17 Cal.3d at p. 435.)

Notably, section 314 of the Restatement Second of Torts provides:  "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."  However, subsequent sections of the Restatement Second of Torts provide exceptions to, or special applications of, this general rule.  (Rest.2d Torts, § 314, com. a.)  Amstutz relies on one

13.

of these subsequent sections, section 315 of the Restatement Second of Torts, to support her contention that PMCPOA owed Amstutz a duty of disclosure with regard to the flooding condition of the Subject Lots.

Section 315 of the Restatement Second of Torts, provides: "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless [¶] (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or [¶] (b) a special relation exists between the actor and the other which gives to the other a right to protection." Amstutz, relying on section 315 of the Restatement Second of Torts, contends PMCPOA had "a fiduciary relationship with the seller, as a member of [PMCPOA] by definition" and a "special relationship with [Amstutz], as the foreseeable victim of what was essentially a swindle, which entitled her to a right of protection by [PMCPOA]." As discussed below, we disagree.

### C. Kovich

It is worth commenting, at this juncture, that the facts of *Tarasoff* bear little similarity, if any, to the facts in the case before us. Moreover, in *Tarasoff*, the intention of the patient Poddar to murder Tatiana Tarasoff was something that, absent a warning from Poddar's treating psychologist, would almost certainly remain hidden from Tatiana and her parents. It is, perhaps, for this reason (in whole or in part) that professional ethics authorize a physician to make such a disclosure even though communications between a physician and patient are generally privileged. (See *Tarasoff, supra*, 17 Cal.3d at pp. 441–442.)[8] As discussed *post*, the Legislature has imposed duties on real property sellers to make disclosures of known conditions affecting the value and desirability of the

---

[8] "[A]s stated in the Principles of Medical Ethics of the American Medical Association (1957), section 9: 'A physician may not reveal the confidence entrusted to him in the course of medical attendance … *unless he is required to do so by law or unless it becomes necessary in order to protect the welfare of the individual or of the community*.'" (*Tarasoff, supra*, 17 Cal.3d at pp. 441–442, fn. omitted.)

real property. Thus, unlike the need for disclosure at issue in *Tarasoff*, there is, arguably, less imperative for a homeowners' association to make the disclosures at issue in this case.

The facts in *Kovich* are much closer to the facts in the present case than are the facts in *Tarasoff*. In *Kovich*, the plaintiff purchased a townhouse from a seller and discovered, after the close of escrow, that "townhouses [in the development] had cracked walls and slabs." (*Kovich, supra*, 41 Cal.App.4th at p. 865.) The plaintiff sued the seller and the homeowners' association (HOA) for negligence, fraudulent concealment, and intentional misrepresentation. (*Ibid*.) The plaintiff alleged that the HOA knew of the construction defects and was in the process of suing the developer for the same. (*Ibid*.) The plaintiff alleged the HOA "kept the information secret and breached a duty to disclose the information to prospective purchasers so they 'could assess the proper value of the units.'" (*Ibid*.) The trial court sustained the HOA's demurrer and the appellate court affirmed. (*Id*. at pp. 865–866, 870.)

The *Kovich* court observed that the plaintiff did not allege the HOA "acted as a seller, was a party to the contract, or assumed a special relationship with [the] appellant." (*Kovich, supra*, 41 Cal.App.4th at p. 866.) It also observed that a *seller* is "under a duty to disclose information materially affecting the value or the desirability of the property." (*Ibid*.) "'The obligation to provide buyers with the above data rests with the [seller], not the association, and is in addition to the transfer disclosure obligations applicable to most sellers of one to four residential dwelling units ….'" (*Id*. at pp. 866–867.) The *Kovich* court held that the HOA "had a fiduciary relationship with the seller and other association members, not [the purchaser]." (*Id*. at p. 867.)

The *Kovich* court wrote, "[w]here, as here, the seller is charged with the responsibility of disclosing information to a purchaser, no public interest would be served by imposing the same disclosure requirements on a homeowners association. We reject

the argument that [the HOA] had a duty to monitor the seller's disclosures or volunteer information about construction defects." (*Kovich, supra*, 41 Cal.App.4th at p. 869.)

Amstutz seeks to distinguish *Kovich* by noting that there were no facts alleged in *Kovich* "that the HOA assumed a special relationship with the purchaser or was a party to the contract," and argues that "it is reasonable to infer that [PMCPOA] is a party to the escrow proceedings, as there must necessarily be an agreement by every purchaser to abide by the CC&R's[9] of the [PMCPOA], and to pay the annual assessments the [PMCPOA] charges every owner of every lot. This is how virtually every homeowners' association works. These commitments by a purchaser cannot happen after the close of escrow, as a new purchaser would have no obligation to abide by the CC&R's, nor to pay any annual assessments otherwise."

We reject the argument that PMCPOA was a party to the purchase and sale transactions (or escrow proceedings) between Amstutz and the respective sellers of Lots A and B. Amstutz's argument contains no citations to authority to support her description of the escrow process. Consequently, the argument is forfeited. (*Needelman v. DeWolf Realty Co., Inc.* (2015) 239 Cal.App.4th 750, 762 ["Issues not supported by argument or citation to authority are forfeited."].) Moreover, there are no allegations in the FAC to support the argument. CC&R's are typically recorded instruments (6 Miller & Starr, Cal. Real Estate (4th ed. 2025) § 16.1, p. 317) and, subject to certain requirements and limited exceptions, are binding upon successive owners upon acquiring the title to the land if the instrument so provides (§§ 1465, 1468). "The benefits or burdens *pass by implication of law rather than under principles of contract*." (*Anthony v. Brea Glenbrook Club* (1976) 58 Cal.App.3d 506, 510, italics added.) "[M]ere

---

**9**    The abbreviation "CC&R's" commonly refers to covenants, conditions and restrictions and "normally refer to a recorded instrument setting forth a common plan or scheme for mutual and reciprocal covenants or equitable servitudes covering a subdivision or tract of land that is to be divided and sold to others." (6 Miller & Starr, Cal. Real Estate (4th ed. 2025) § 16.1, p. 317.)

constructive notice … is sufficient to make it enforceable against the transferee." (*MacDonald Properties, Inc. v. Bel-Air Country Club* (1977) 72 Cal.App.3d 693, 700.) Consequently, we disagree that it is reasonable to infer that PMCPOA was a party to the transactions between Amstutz and the respective sellers of Lots A and B.

It is true that homeowners' associations owe a fiduciary duty to its members. (*Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 650–651.) However, the scope of those duties typically extend to matters involving the management and upkeep of the common areas of the residential development, and other matters that are provided for in CC&R's. (See *ibid*. ["[I]n recognition of the increasingly important role played by private homeowners' associations in such public-service functions as maintenance and repair of public areas and utilities, street and common area lighting, sanitation and the regulation and enforcement of zoning ordinances, the courts have recognized that such associations owe a fiduciary duty to their members."].)

Even if we were to accept the proposition that PMCPOA's relationship with its members comes within section 315 of the Restatement Second of Torts, we agree with the reasoning in *Kovich*, and believe sufficient policy reasons exist to reject the contention that PMCPOA owed Amstutz a duty of disclosure with regard to her purchase of the Subject Lots.

### D. Rowland Factors

As Amstutz recognizes in her opening brief, the court in *Tarasoff* acknowledged that the duty to use ordinary care and skill to avoid danger to persons or property "is subject to a 'balancing of a number of considerations'"—considerations first outlined in *Rowland*.

"The *Rowland* court set out seven nonexclusive factors that should be considered in determining whether to create a judicial exception to the general duty of care articulated in section 1714. (*Rowland, supra*, 69 Cal.2d at p. 113.) Those factors are (1) 'the foreseeability of harm to the plaintiff'; (2) 'the degree of certainty that the

17.

plaintiff suffered injury'; (3) 'the closeness of the connection between the defendant's conduct and the injury suffered'; (4) 'the moral blame attached to the defendant's conduct'; (5) 'the policy of preventing future harm'; (6) 'the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach'; and (7) 'the availability, cost, and prevalence of insurance for the risk involved.' [Citation.]

"The first three *Rowland* factors relate to foreseeability and the remaining four pertain to public policy considerations. [Citation.] As stated in *Rowland* and other California Supreme Court cases, 'it is clear that in the absence of a statutory provision declaring an exception to the fundamental principle enunciated by section 1714 …, no such exception should be made *unless clearly supported by public policy*.' [Citations.]

"'[T]he *Rowland* factors are evaluated at a relatively broad level of factual generality.' (*Cabral* [*v. Ralph's Grocery Co.* (2011)] 51 Cal.4th [764,] 772.) '[T]he legal decision that an exception to … section 1714 is warranted, so that the defendant owed no duty to the plaintiff, or owed only a limited duty, *is to be made on a more general basis suitable to the formulation of a legal rule ….*' (*Cabral, supra*, 51 Cal.4th at p. 773, original italics omitted, italics added.) Thus, in applying the *Rowland* factors, we ask 'whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy.'" (*Union Pacific Railroad Co. v. Superior Court* (2024) 105 Cal.App.5th 838, 853–854 (*Union Pacific*).) Applying the *Rowland* factors to the case at bar, we conclude public policy weighs heavily against finding a duty of care on the part of PMCPOA in this matter.

### 1. *Foreseeability Factors*

"""[A]s to foreseeability, … the court's task in determining duty 'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced

18.

that liability may appropriately be imposed ....'" [Citations.] ... "'[F]oreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.'""" (*Union Pacific, supra*, 105 Cal.App.5th at p. 854.)

The category of negligent conduct at issue is the nondisclosure of information by a homeowners' association affecting the value and/or desirability of real property being sold. As discussed, a seller is under a duty to disclose such information to the purchaser. (§§ 1102.3, 1102.6; *Kovich, supra*, 41 Cal.App.4th at p. 866.) If a seller "willfully or negligently violates or fails to perform" such disclosure duties, it "shall be liable in the amount of actual damages suffered by a transferee." (§ 1102.13.) It is certainly foreseeable that, if a seller fails to disclose to a buyer material facts relevant to the value or desirability of real property being sold, the buyer will suffer harm since they will likely pay more than the property was worth (or will have purchased the property when they might otherwise have declined to purchase it). Under such circumstances, the remaining foreseeability factors (certainty of injury, and the closeness of connection between the conduct and the injury) would also likely be met. We question, however, whether it would be foreseeable to a third party homeowners' association that a seller of real property would violate his or her statutory duties of disclosure so as to justify or necessitate the association intermeddling in the purchase and sale transaction.

### 2. *Policy Factors*

In our view, the policy factors identified in *Rowland* weigh heavily against finding a duty of disclosure on the part of PMCPOA.

""""Moral blame has been applied to describe a defendant's culpability in terms of the defendant's state of mind and the inherently harmful nature of the defendant's acts.'" [Citation.] "'[T]his factor in the duty analysis is intended to describe a high degree of moral culpability beyond that associated with ordinary negligence.'" [Citation.] A

19.

"'high[] degree of moral culpability'" may be found "'where the defendant (1) intended or planned the harmful result [citation]; (2) had actual or constructive knowledge of the harmful consequences of their behavior [citation]; (3) acted in bad faith or with a reckless indifference to the results of their conduct [citations]; or (4) engaged in inherently harmful acts.''" (*Union Pacific, supra*, 105 Cal.App.5th at p. 858.)

Here, there are no facts alleged that demonstrate PMCPOA actually knew that the sellers of the Subject Lots failed to disclose to Amstutz the flooding potential of the Lots. Amstutz alleges PMCPOA should have known that the condition was not disclosed to her or prior owners because of the "ever increasing prices of the sales ...." This allegation is insufficient to put PMCPOA on constructive notice that a seller had violated his or her duty of disclosure. Moreover, there are no allegations that demonstrate PMCPOA was aware of the sale price attached to the Lots, or that Amstutz or her predecessors-in-interest inquired of PMCPOA concerning the Lots. No moral blame can be attributed to PMCPOA based on the allegations in the FAC.

"The policy of preventing future harm is ordinarily served by allocating costs to those responsible for the injury and thus best suited to prevent it. [Citation.] 'In general, internalizing the cost of injuries caused by a particular behavior will induce changes in that behavior to make it safer. That consideration may be "outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability.'" (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1087.) Here, the party best suited to prevent the harm caused by a failure to disclose material information concerning the property is the seller—not a homeowners' association. Seemingly, the Legislature has recognized this by enacting statutes that mandate the seller and/or the seller's agent disclose known property defects. (§ 1102 et seq.)

The next policy factor, which in our opinion, weighs most heavily against imposing a duty of disclosure onto a homeowners' association is the high burden it would

20.

place on the association. If such a burden was placed on a homeowners' association, the association would have to monitor all sales of property within its management purview, review all disclosures made in connection with all pending sales, and then compare those disclosures against facts known to the association's directors and staff to ensure that all proper disclosures were made. A homeowners' association would need to devote additional funds and resources to enable it to perform those extraordinary functions (e.g., by hiring additional employees, contractors, attorneys and/or other experts), and would result in higher annual assessments for its members.

In many likely circumstances, it would be difficult for the homeowners' association to adequately ascertain or assess whether, in a given situation, a seller's disclosure of a particular condition was required, whether a disclosure was made and was sufficient, and whether the information known to the association was such that it should be disclosed to a potential purchaser even though the seller did not disclose it. If the association decided a seller's disclosures were incorrect or inadequate, the association might incorrectly deem it necessary to make additional disclosures and, thereby, subject itself to liability in the event the disclosures caused the sale to fall through, caused a renegotiation of terms, or caused other damages.

These same considerations led the *Kovich* court to conclude a homeowners' association owes no duty to disclose construction defects to prospective purchasers of property within its purview. (*Kovich, supra*, 41 Cal.App.4th at p. 869.) The *Kovich* court wrote: "Applying the factors set forth in *Rowland …, supra*, 69 Cal.2d 108, we hold that no public policy would be served by requiring a homeowners['] association to disclose construction defects to a prospective purchaser. Such a disclosure requirement would impose an unreasonable burden on [the HOA] and require it to incur substantial costs to assemble the information, make a timely disclosure, and monitor all potential sales in the common interest development. The insurance costs would be enormous and subject it to a host of claims by disgruntled purchasers. Those costs would be passed on to [the

21.

HOA's] members, undermine the fiduciary duties owed by [the HOA's] board of directors, and subject [the HOA] to new theories of liability." (*Ibid.*)

We discern no material difference in the alleged relationship between the homeowners' association and purchaser in *Kovich*, and the alleged relationship between PMCPOA and Amstutz. Our review of the above policy factors leads us to conclude that no duty should be imposed on a homeowners' association to make disclosures of the nature alleged herein. Consequently, we will affirm the trial court's December 30, 2024, order sustaining PMCPOA's demurrer without leave to amend in its entirety.[10]

## III.  The Causes of Action Against JRE and Mowry

In her FAC, Amstutz alleged real estate agent Mowry and real estate broker JRE represented the sellers of Lot B in connection with Amstutz's purchase of Lot B. She alleged that Mowry and JRE "had a special fiduciary relationship with [Amstutz] due to that status" and "had a fiduciary duty of care to [Amstutz]." Specifically, Amstutz alleged Mowry and JRE had a duty "to make a competent and vigorous visual inspection to discover [and] disclose any material defects in … Lot B. Such an inspection, if competent and vigorous, done with reasonable thoughtfulness, would have included questions about the reasons Lot B was undeveloped for forty-seven years since being offered for residential development .…"

In her opening brief on appeal, Amstutz relies on section 2079 and CACI No. 4108 (May 2020 revision) to support her contentions. She also argues, "[i]f the [trial] court considered … parts of the allegations … too uncertain or unclear," the trial court should have granted her leave to amend to clarify the FAC.

In response, JRE and Mowry argue they owed no fiduciary duty to, and had no special relationship with, Amstutz and, therefore, the trial court was correct in sustaining

---

**10**      On appeal, Amstutz has not proffered any facts that it would allege to salvage its claims against PMCPOA in the event leave to amend was granted.

22.

their demurrer to the second cause of action for breach of fiduciary duty.  They also argue they had no duty to inspect Lot B for subterranean defects and that, under section 1102.4, subdivision (a), they have no liability for failing to disclose the alleged existence of the artesian springs and/or flooding potential of Lot B because they had no personal knowledge of those facts.  They argue that the statute of limitations for a breach of the *statutory* duties they owed Amstutz is two years (see § 2079.4), and that the limitation period "expired more than five years before [Amstutz] filed her Complaint."  Finally, they contend the alleged existence of the artesian springs could not, under any circumstances, have been detected by competent and diligent inspection of the property.

### A.      Amstutz Has Abandoned Her Claim That JRE and Mowry Owed Her Fiduciary Duties

Despite the allegations of her FAC, Amstutz, on appeal, makes no effort to demonstrate that JRE and Mowry owed her *fiduciary* duties.  In her reply brief on appeal, she "concedes that the allegations of the FAC were perhaps not well pled, in that they asserted that these respondents, Mowry and [JRE] had a fiduciary duty to [Amstutz]" and that "[i]f given the opportunity to amend, [Amstutz] would delete the fiduciary duty allegations as to these Respondent[s], and restate the negligence cause of action …."  Consequently, she has abandoned and waived any claim of error with regard to the second cause of action against JRE and Mowry.  (*Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 241 [failure to challenge demurrer as to a particular cause of action results in waiver or abandonment of any claim of error regarding that issue].)

Accordingly, we will affirm the trial court's December 31, 2024, order sustaining JRE and Mowry's demurrer as to the second cause of action against JRE and Mowry.

### B.      The Negligence Claim Against JRE and Mowry

As mentioned, Amstutz relies on section 2079 and a corresponding jury instruction, CACI No. 4108, to support her negligence claim against JRE and Mowry.

She cites to *Field v. Century 21 Klowden-Forness Realty* (1998) 63 Cal.App.4th 18 (*Field*), for the proposition that "Section 2079 requires sellers' real estate brokers, and their cooperating brokers, to conduct a 'reasonably competent and diligent visual inspection of the property,' and to disclose all material facts such an investigation would reveal to a prospective buyer." (*Id.* at p. 23, fn. omitted.) She also cites *Padgett v. Phariss* (1997) 54 Cal.App.4th 1270 for the proposition that "'Where a duty is found to exist, a real estate agent must fulfill it by exhibiting the degree of care and skill ordinarily exhibited by professionals in the industry.'" (*Id.* at p. 1279.)

Section 2079 reads, in relevant part: "It is the duty of a real estate broker or salesperson, licensed under Division 4 (commencing with Section 10000) of the Business and Professions Code, to a prospective buyer of residential real property *improved with one to four dwelling units or a manufactured home* as defined in Section 18007 of the Health and Safety Code, to conduct a reasonably competent and diligent visual inspection of the property offered for sale and to disclose to that prospective buyer all facts materially affecting the value or desirability of the property that an investigation would reveal …." (*Id.*, subd. (a), italics added.) Amstutz has conspicuously omitted any reference to the above italicized language.

CACI No. 4108 (May 2020 revision) is based on section 2079,[11] and instructs the jury that a seller's real estate agent and/or broker "must conduct a reasonably competent and diligent visual inspection of the property offered for sale" and must disclose to a plaintiff buyer "all facts that materially affect the value or desirability of the property that the investigation revealed or should have revealed." (CACI No. 4108.)

---

[11] CACI No. 4108 is titled "Failure of Seller's Real Estate Broker to Conduct Reasonable Inspection—Essential Factual Elements (Civ. Code, § 2079)." Under the "Directions for Use" section of CACI No. 4108, it states, "Give this instruction if the seller's real estate broker or salesperson did not conduct a visual inspection of the property and make disclosures to the buyer as required by Civil Code section 2079[, subdivision ](a)."

Section 2079, by its express terms, applies only to residential real property that is "improved with one to four dwelling units or a manufactured home .…" (*Id.*, subd. (a).) However, Amstutz expressly alleged in her original complaint that "[n]o construction has ever apparently been undertaken by any owner of Lot B" and contended, in her opposition to Haas and PEP's demurrer to the original complaint that "Lot B, as described in the Complaint, was the only undeveloped lot in the area .…" Similarly, in her FAC, Amstutz alleged that "[n]o construction has ever apparently been undertaken by any owner of Lot B" and that JRE and Mowry, as part of their alleged duties, should have questioned why "Lot B was undeveloped for forty-seven years since being offered for residential development .…" Because Lot B has never been improved with a residential structure, section 2079 appears to have no application to JRE and Mowry in connection with their representation of the seller of the vacant land referred to as Lot B.

"The plaintiff[] bear[s] the burden of demonstrating that the demurrer was sustained erroneously. [Citation.] … [¶] It is the responsibility of the appellant, …, to support claims of error with meaningful argument and citation to authority. [Citations.] When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration. [Citations.] … We are not required to examine undeveloped claims or to supply arguments for the litigants." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) "An appellate court is not required to examine undeveloped claims, nor to make arguments for parties." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.)

Amstutz has not directed us to any authority that suggests the duties imposed by section 2079 have been extended to an agent or broker representing the seller of vacant land, and she has made no argument to that effect.[12] Amstutz's citation to *Field, supra*,

---

[12] The Legislature enacted section 2079 to "codify and make precise the holding in *Easton v. Strassburger* [(1984)] 152 Cal.App.3d 90" (Stats. 1985, ch. 223, § 4, p. 1222, italics added.) *Easton* involved the sale of land "improved with a 3,000-square-foot home, a swimming pool,

63 Cal.App.4th 18, does not aid her because it involved the sale of residential property (*id*. at p. 21) and did not purport to extend the operation of section 2079 to the sale of vacant land. Moreover, in our research we have found no authority to suggest the Legislature intended the duties imposed by section 2079 to also apply in connection with the sale of vacant land, and the express language of the statute does not support such an interpretation. (See *Smith v. Rickard* (1988) 205 Cal.App.3d 1354, 1360 ["the Legislature intended the duties set out in section 2079 to apply only to brokers selling residential properties of four or fewer dwellings"].)[13] Amstutz's reliance on CACI No. 4108 does not aid her. CACI No. 4108 is premised upon section 2079, and provides no basis upon which to conclude the statute should be extended beyond its express terms.

Consequently, we conclude Amstutz has not met her burden of demonstrating that the trial court erred in sustaining JRE and Mowry's demurrer to Amstutz's third cause of action for negligence.[14]

and a large guest house." (*Easton, supra*, at p. 96.) *Easton* did not involve the sale of vacant land.

[13] Although not relied on by Amstutz, we do note that a seller's agent does have nonfiduciary duties of disclosure to a buyer as reflected in section 2079.16 (*Holmes v. Summer* (2010) 188 Cal.App.4th 1510, 1528), and that those duties do extend to the sale of vacant land (§§ 2079.13, subds. (j), (k), 2079.16 ["A Seller's agent … has the following affirmative obligations: [¶] … [¶] To the Buyer and Seller: [¶] (a) Diligent exercise of reasonable skill and care in performance of the agent's duties. [¶] (b) A duty of honest and fair dealing and good faith. [¶] (c) A duty to disclose all facts *known to the agent* materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties." (Italics added.)].)

However, Amstutz has not alleged in the FAC that JRE or Mowry actually knew of the existence of the subterranean artesian springs or of the flooding potential of the property. Rather, Amstutz alleges that JRE and Mowry failed to conduct a competent and diligent inspection of the property and that, had they conducted an appropriate inspection and inquired as to the reasons Lot B remained undeveloped, they would have learned of the existence of those attributes. Thus, Amstutz's claim falls outside the scope of section 2079.16.

[14] The fact that JRE and Mowry assumed, for purposes of their brief on appeal, that section 2079 applies to the sale of Lot B does not alter our conclusion. JRE and Mowry have not identified any authority to suggest section 2079 applies to the sale of vacant land. "[T]he existence and scope of a duty are questions of law …." (*Staats v. Vintner's Golf Club, LLC*

### C. Whether the Trial Court Should Have Been Granted Amstutz Leave to Amend Her Third Cause of Action for Negligence

Amstutz contends the trial court should have granted her leave to amend her cause(s) of action against JRE and Mowry. In her opening brief, Amstutz states: "If given leave to further amend the complaint, [she] would have, and shall, allege the following: [¶] At least four different agents or representatives of [JRE], prior to [Amstutz's] purchases herein and dating back to at least 1994, had advised at least six potential purchasers of the properties, that the properties were subject to unpredictable catastrophic flooding." (Boldface omitted.)

Amstutz relied on CACI No. 4109 to support this request for leave to amend. CACI No. 4109 provides: "A real estate broker for the seller of property must disclose to the buyer all facts *known to the broker* regarding the property or relating to the transaction that materially affect the value or desirability of the property. A broker must disclose these facts *if the broker knows or should know* that the buyer is not aware of them and cannot reasonably be expected to discover them through diligent attention and observation. The broker does not, however, have to disclose facts that the buyer already knows or could have learned with diligent attention and observation." (Italics added.)

In her reply brief on appeal, however, Amstutz takes an alternative approach at proffering an amendment to the negligence cause of action against JRE and Mowry. She states she would "restate the negligence cause of action as to [JRE and Mowry] in this fashion: [¶] Defendants … Mowry and [JRE], as agents and broker for the sellers of Lot B, owed [Amstutz] a duty to use reasonable care in their obligation to conduct a reasonably competent visual inspection of the property, Lot B. Such inspection and disclosures, through a lack of the due care expected of them, failed to disclose that the agent and brokerage had prior knowledge that the lot was subject to unpredictable

---

(2018) 25 Cal.App.5th 826, 837.) Thus, we are not bound by JRE and Mowry's assumption that section 2079 applies to the sale of unimproved land.

catastrophic flooding from artesian springs.  [¶]  Paragraph 7 of the FAC would also be incorporated, which alleges that prior to the purchases of said lots in 2017, [Amstutz] had not been warned nor otherwise advised that both properties were subject to periodic catastrophic flooding from artesian springs under both Lots A and B.  Until May 2023, [Amstutz] had no reason to believe or discover, and did not know facts that would have caused a reasonable person to suspect, that she may have suffered harm from someone else's wrongful or careless conduct in purchasing the lots.  Thereafter, she discovered the probable knowledge of, and non[-]disclosure of this material fact, by Mowry and [JRE] and the other defendants herein."

"The plaintiff bears the burden of proving there is a reasonable possibility of amendment.  [Citation.]  The plaintiff may make this showing for the first time on appeal.[15]  [Citations.]  [¶]  To satisfy that burden on appeal, a plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.'  [Citation.]  …  The plaintiff must clearly and specifically set forth the 'applicable substantive law' [citation] *and the legal basis for amendment .…*  Allegations must be factual and specific, not vague or conclusionary."  (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43–44, italics added.)  Amstutz has not carried her burden in this regard.

Amstutz's initial proffer of alleged facts in support of her request for leave to amend asserted that other real estate agents or representatives of JRE (as far back as 1994—23 years prior to Amstutz's purchase) advised prospective purchasers of the flooding potential of Lot B.  Amstutz appears to be relying on a theory of imputed knowledge to suggest that JRE and Mowry both should be held liable for the knowledge of those other purported agents or representatives.  Although it is true that a seller's real estate agent is "required to disclose to the buyer all *known* facts materially affecting the

---

**15**     Amstutz did not seek leave to amend from the trial court.

28.

value or desirability of a property that are not known to or reasonably discoverable by the buyer" (*Horiike v. Coldwell Banker Residential Brokerage Co.* (2016) 1 Cal.5th 1024, 1040, italics added), Amstutz does not provide any legal argument or authority to support the theory that liability may be premised on imputed knowledge.[16] "An appellate court is not required to examine undeveloped claims, nor to make arguments for parties." (*Paterno v. State of California, supra*, 74 Cal.App.4th at p. 106.)

Amstutz's second proffer of alleged facts to support her request for leave to amend only muddies the waters. It appears from her second proffer that she still relies, in whole or in part, on her assertion that JRE and Mowry had an "obligation to conduct a reasonably competent visual inspection of … Lot B," which is vacant land that has never been improved with a residential structure. Amstutz continues to rely on section 2079 as a basis of that purported obligation. As discussed previously, the express language of section 2079, subdivision (a), limits such a duty to situations where the property for sale is "improved with one to four dwelling units or a manufactured home," which is not the case here. She vaguely suggests this duty to inspect and report on issues revealed by the

---

[16] Amstutz does not contend that any of the JRE agents involved in the transaction had actual knowledge of Lot B's flooding potential. In our review, we have not come across any case wherein a seller's real estate broker has been held liable to a buyer for nondisclosures premised on knowledge imputed from past agents who had no involvement in the transaction at issue and who worked for the broker decades ago. If supportive case law exists, it was incumbent upon Amstutz to so advise the court.

In the absence of legal authority and cogent argument to support the proposition, we consider the matter forfeited (see *Allen v. City of Sacramento, supra*, 234 Cal.App.4th at p. 52) and decline to adopt it for purposes of this case. Moreover, there are practical and policy concerns that caution against adopting such a proposition. The burden it would place on real estate brokers would be great. To satisfy that burden, a broker might reasonably be required to make inquiries of all agents, past and present, in the broker's employ, and/or to review files from over many years (or, in this case, decades) to determine whether any potential defects were known. The more remote in time the involvement of past agents, the less likely relevant information, if it ever existed, would come to the broker's attention. Yet, liability might still be premised on a lack of such disclosure if the information eventually came to the fore. This would likely have a significant, disruptive impact on the real estate industry. Perhaps a compelling case for adopting such proposition might be made. Here, it was not.

inspection would somehow have exposed that the "agent and brokerage had prior knowledge" of Lot B's flooding potential. It does not follow that a current inspection of Lot B necessarily would demonstrate that JRE or Mowry had prior knowledge of Lot B's flooding potential. Moreover, based on her prior proffer, any alleged prior knowledge of JRE and Mowry of the Lot B's flooding potential appears to be premised, once again, on a theory of imputation that is not discussed or supported by any cogent argument or legal authority.

Based on the foregoing, we conclude Amstutz has not met her burden of demonstrating how the FAC may be amended to support a negligence claim against JRE and Mowry. Consequently, Amstutz has failed to show the trial court abused its discretion in denying her leave to amend.[17]

### DISPOSITION

We affirm the trial court's December 30, 2024, order to dismiss action as to PMCPOA and the court's December 31, 2024, order to dismiss action against defendants Mowry and JRE, in their entirety.

PMCPOA, JRE and Mowry are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

MEEHAN, J.

WE CONCUR:

HILL, P. J.

DESANTOS, J.

---

[17] In light of our disposition, we need not address the additional contentions of PMCPOA, JRE and Mowry.